UNITED STATES of America

v.

ONE BALLY BOUNTY IN–LINE, BINGO–TYPE, MULTIPLE COIN, MULTIPLE FREE–PLAY PINBALL MACHINE, SERIAL NO. B799.

Civ. A. No. 15947.

United States District Court
D. Maryland.
Nov. 25, 1966.

---

7. 42 U.S.C. § 405(g).

Thomas J. Kenney, U. S. Atty., and Fred K. Grant, Asst. U. S. Atty., for the United States.

Paul R. Connolly and David N. Webster, Washington, D. C., and Joseph M. Wyatt, Baltimore, Md., for respondent; Hogan & Hartson, Washington, D. C., Wyatt & Jones, Baltimore, Md., Martin M. Nelson and Murtaugh & Nelson, Chicago, Ill., of counsel.

NORTHROP, District Judge.

This matter comes before the court and a jury upon a libel filed by the United States of America, under 15 U.S.C. §§ 1171,[1] 1172,[2] and 1177[3] on November 5, 1964, and upon the answer to the libel filed for and on behalf of the claimant, State Sales and Service Corporation, a Maryland corporation, with its principal place of business at 1825 Guilford Avenue, Baltimore, Maryland.

The respondent, a highly sophisticated pinball machine, was transported in interstate commerce from Chicago, Illinois, to Baltimore, Maryland, in March, 1964, and was seized in Baltimore, Maryland, on March 11, 1964.

The trial of the case was conducted in two parts. First, the court propounded the following question to a jury:

"Was the coin-operated pinball machine, No. B799, designed and manufactured primarily for use in connection with gambling, and by the operation of which a person may become entitled to receive as a result of the application of an element of chance, any money or property?"

The jury returned with an affirmative answer to the question.

After the jury found that the respondent machine was a gambling device within the meaning of 15 U.S.C. §§ 1171 and 1172 and thus possibly subject to confiscation under 15 U.S.C. § 1177, it becomes incumbent upon the court to determine whether such a "gambling device" is "specifically enumerated as lawful in a statute" of the state into which it was

1. § 1171(a) (2) reads: "The term 'gambling device' means—any other machine or mechanical device * * * designed and manufactured primarily for use in connection with gambling, and * * * (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property * * *."

2. § 1172 reads: "It shall be unlawful knowingly to transport any gambling device to any place in a State * * * from any place outside of such State * * * *Provided further*, That it shall not be unlawful to transport in interstate or foreign commerce any gambling device into any State in which the transported gambling device is specifically enumerated as lawful in a statute of that State."

3. § 1177 reads: "Any gambling device transported, delivered, shipped, manufactured, reconditioned, repaired, sold, disposed of, received, possessed, or used in violation of the provisions of this chapter shall be seized and forfeited to the United States."

sent as set forth in 15 U.S.C. § 1172 and thus free it from possible confiscation under 15 U.S.C. § 1177.[4]

The respondent machine is similar to the one described in United States v. Two Coin-Operated Pinball Machines, Nos. B–1197 and B–1378, 241 F.Supp. 57 (1965 W.D.Ky.). The court adopts the statement of facts as set forth by the District Court for the Western District of Kentucky to the extent that it corresponds with the testimony before this court.

"The [respondent is a] coin activated electrically operated [machine]. The [machine] when assembled and ready for use consist[s] of a vertical section attached to a base section to which are secured four legs. The base section contains a plunger device, a number of holes drilled into an inclined playboard and a quantity of posts with rubber bumpers placed at intervals thereon. The [device is] equipped with eight metal balls, five of which are released for play upon insertion of a coin. The vertical section has a glass front upon which the results of play are recorded by electrically operated equipment. The object of play of the [device] is to propel the balls by means of the plunger onto the inclined playboard so that the ball will fall into certain holes and thereby light corresponding light bulbs located on the vertical section of the [machine]. When three or more bulbs are lit in a row, or in some other predetermined order, the machine registers * * * 'free plays'. The [machine is] so constructed that any number of coins may be inserted therein before actual play of the game begins. The number of 'free plays' to be awarded for successful operation of the device can be increased by insertion of additional coins prior to play of the machine, although the rate of increase of free play awards cannot be controlled by the player and may or may not increase upon the insertion of a particular coin. The machine also provides other 'features', the most prominent of which is denominated 'skill-shot' which will award a designated number of 'free plays' if the first ball played falls into any of several predesignated holes. After striking the ball with the plunger, the ball is propelled onto the playboard and descends the inclined plane * * * dependent [mainly] upon the law of gravity and chance contacts with the posts affixed to the board. The player has [nearly] no control over this descent and only negligible, if any, skill is involved in the operation or play of the device. Free plays won on the machine are recorded on a three-digit counting meter (Replay register). The register is numbered so that it will apparently record 999 free games but a stop is contained in [the device] so that, in fact, the register will record only 899 free games. Free games so recorded may be used by depressing appropriate buttons to activate the machine; to activate the mechanism which controls the increase of the free game awards, or to activate other features of the machine. Each such use decreases the number shown on the replay register by one. The replay register can be immediately cleared by operation of an on-off switch located on the base section of the device or by disconnecting the device from its power source and then reconnecting it. Inside the base section are located two additional meters referred to as the total plays meter and the replays meter. The total plays meter records the number of coins inserted in the device and the number of free plays used in the play of the machine. The replays meter records the total number of free plays which have been won on the play of the machine. Subtracting the total registered on the replays meter and the total of coins in the coin box from the total registered on

<hr/>

4. Since this court handed down its decision in United States v. 46 Gambling Devices, 138 F.Supp. 896 (1956 D.Md.) in which 15 U.S.C. § 1172 was construed, this section has been amended to allow an exemption for the importation of gambling devices into states which have "specifically enumerated as lawful" such gambling devices even though the state did not reenact its statute as this court had required under 15 U.S.C. § 1172 before it was amended.

the total plays meter will result in the number of free games eliminated from the machine without being used in play. The [device is] so equipped that the replay meter may be readily rewired in order to record only the number of free games so eliminated."

The respondent machine had no payout unit on it. All that a player could receive directly from the machine was free games. There was testimony that with slight adjustments the Bally Bounty machine can be rigged so that it pays off in coin or tokens. Indeed its manufacturer ships it into Nevada and foreign countries where such practice is legal. The respondent machine was not assembled to accomplish such a payoff. There was testimony to the effect that owners or lessees of machines of this kind had redeemed the free games for cash. But there was no evidence of any payout from this machine.

Section 1172 of Title 15 of the United States Code provides in pertinent part:

"That it shall not be unlawful to transport in interstate or foreign commerce any gambling device into any State in which the transported gambling device is specifically enumerated as lawful in a statute of that State."

The Government places great stress on Section 1 of Chapter 617, Laws of Maryland (1963), codified in § 264B of Article 27 of the Annotated Code of Maryland (1957), and on Section 2 of Chapter 617, Laws of Maryland (1963), to show that this machine is outlawed in Maryland.

The pertinent parts of Sections 1 and 2 of Chapter 617, on which the libelant relies, read as follows:

"(1) Any machine [is a slot machine and thus unlawful to possess or operate in this state if it is] * * * adapted for use in such a way that, as a result of the insertion or deposit therein * * * of any piece of money, coin, token or other object, such machine * * * is caused to operate or may be operated, and by reason of any element of chance * * * the user may receive or *become entitled to receive* any piece of money, coin, token or other object representative of and convertible into money * * *.

"(2) The intent of the legislature in the enactment of the aforegoing act is expressed as not intending to apply to the machine, apparatus or device commonly known or colloquially referred to, an 'pinball machine,' so long as said machine, apparatus or device *does not permit* any compensation, remuneration, recompense, reward, repayment or winnings beyond an automatic replay of a game or games mechanically provided upon said machine." [emphasis supplied]

The Government points out that the jury found under the federal statute that the user could become entitled to receive some piece of money. That is true. The jury, however, was given an instruction based on federal, not Maryland law. Before the court can say what weight it will give to the jury's determination, it must decide that the law of Maryland is the same as the law of the United States, that the two statutes—though enacted one by the Congress of the United States and one by the General Assembly of Maryland—are in pari materia.

The Government also claims that the machine "permits" payment since the machine allows the replays won to be run off without actual playing, the winner instead receiving payment for the games that he has won. This court cannot agree with the Government's position.

The very same legislature which enacted the anti-slot machine statute, chapter 617 of the Laws of Maryland (1963), re-enacted § 19 of Article 56 of the Maryland Annotated Code. Under § 19 of Article 56, which applies to Baltimore City, free-play pinball machines may be licensed. A "free play pinball machine" is defined by this section as

"a machine which, upon the insertion of one or more coins, causes the mechanism to release one or more balls for the use of the player, to be propelled by means of a plunger.

"Upon the obtaining of certain scores or combinations of numbers, the machine rewards the player with a specified number of free games, allowing the player to continue to play the machine without the insertion of additional coins or tokens. The free play pinball machine shall not pay out either cash or tokens."

It is clear that the respondent may be registered in the City of Baltimore in Maryland.

 Interpreting § 19 of Article 56 of the Maryland Code Annotated and Chapter 617 of the Laws of Maryland (1963), it becomes apparent that any machine that can be licensed under § 19 of Article 56 is not outlawed by Chapter 617. If this were not the intention of the legislature, why would it have added Section 2 to Chapter 617 to express the legislature's intent to make sure that pinball machines were not outlawed? "Permit" as used by Section 2 of Chapter 617 clearly means "permit as a function of the machine." The two sections were enacted during the same legislative session. The court must interpret them, if it can, so that they are not in contradiction with each other. These sections are in pari materia.

The legislature in its enactment of Chapter 617 clearly was aiming to outlaw payouts by the machine. Reading Section 1 of Chapter 617 (§ 264B of Article 27 of the Annotated Code of Maryland) as a whole, I find that "become entitled to receive" as used in this section means "become entitled to receive" from the machine and not "become entitled to receive" as a result of playing the machine as used in § 1171 of Title 15 of the United States Code.

Unfortunately, the Court of Appeals of Maryland has not had a chance to throw light on the proper construction of either § 19 of Article 56 or of Chapter 617. In its interpretation of a similar statute, the Maryland Court of Appeals indicated that the machines are lawful, but any payoff or act of paying is unlawful. Bell v. Board of County Com'rs of Prince Georges County, 195 Md. 21, at 27, 72 A.2d 746 (1950). See also, Brown v. State, 210 Md. 301, 123 A.2d 324 (1955).

Inasmuch as the machine itself does not pay off, the court is of the opinion that the respondent machine is lawful in the City of Baltimore in the State of Maryland. Thus, it is exempt from confiscation under § 1177 of Title 15 of the United States Code.

The responsibility, at this time, of excluding or permitting pinball machines lies with the General Assembly of Maryland and the wishes of the citizens or the political subdivisions of the State of Maryland.

The Clerk of the Court is instructed to enter a judgment for the claimant with costs.